## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

(1) PEDRO BAEZ,
(2) ANTHONY BAEZ,
(3) AMANDA FORD,
(4) MONICA TROCHE,
(5) BRANNY TAVERAS,
(6) SHASTAALENA BLAIR,
(7) JESSICA HUGHES,
(8) VALERIE LUCIER,
(9) PABLO VIDARTE HERNANDEZ,
(10) ADIANGEL PARADES,
(11) KEVIN MARTINEZ,
(12) RICKY FIGUEROA,
(13) PEDRO VILLOT-SANTIAGO,
(14) IVAN TORRES,
(15) JONATHAN VILLOT
(16) ███████████████,
(17) HECTOR MATOS, and
(18) ███████████████,

Defendants

Criminal No. 19-cr-40049-TSH(s)

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Task Force Officer Adam J. Lord, being sworn, state:

### Introduction and Background

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of

Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal

laws and duly authorized by the Attorney General to request a search warrant.   I am a full-time

Detective with the City of Waltham, Massachusetts Police Department and am currently assigned

to the Federal Bureau of Investigation ("FBI") and Boston Organized Crime Drug Enforcement Task Force ("OCDETF") Strike Force in Watertown, Massachusetts. I have been a Waltham Police Officer since June 2005, and have been assigned to the Detective Division since June 2012 as a narcotics investigator. Since February 2019, I have been assigned as a Task Force Officer ("TFO"), defined as a sworn Special Federal Officer, with the FBI, and a sworn Special Deputy United States Marshal with the United States Marshals Service.

2.      My primary duties as an FBI TFO include the investigation of organized narcotics traffickers, narcotics distribution and money laundering offenses, and other federal and state crimes. I have testified in district, state and federal trial courts. I have participated in the execution of over 100 state and federal search and arrest warrants for narcotics offenses. During my career in law enforcement, I have received training and gained experience related to a variety of criminal activities. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug trafficking conspiracies. In the course of conducting criminal investigations, I have employed the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short-term and long-term narcotics investigations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and toll record data; conducting court-authorized electronic surveillance; and preparing and executing search warrants that resulted in substantial seizures of narcotics, firearms, and other contraband.

3.      I make this affidavit in support of pre-trial detention of defendants (9) PABLO VIDARTE HERNANDEZ (hereinafter, "VIDARTE"), (10) ADIANGEL PARADES (hereinafter, "PAREDES"), (11) KEVIN MARTINEZ (hereinafter, "MARTINEZ"), (12) RICKY FIGUEROA

(hereinafter, "FIGUEROA"), (13) PEDRO VILLOT-SANTIAGO (hereinafter, "VILLOT-SANTIAGO"), (14) IVAN TORRES (hereinafter, "TORRES"), (15) JONATHAN VILLOT and (hereinafter, "JONATHAN"). The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other investigators and witnesses. This affidavit is intended to present facts supporting pre-trial detention of VIDARTE, PAREDES, MARTINEZ, FIGUEROA, VILLOT-SANTIAGO, TORRES, and JONATHAN, and does not set forth all of my knowledge about this matter.

### Background of the Investigation

4.     In September 2018, the FBI Boston Strike Force began an investigation following a fatal overdose on September 7, 2018 (overdose victim hereinafter, "Victim"). Victim's autopsy report indicates that he died from acute fentanyl and heroin intoxication. Text messages found on Victim's phone led agents to identify an individual who Victim contacted to purchase drugs just before his fatal overdose. That individual (hereinafter, "CW-1")[1] agreed to cooperate with law enforcement and advised that the heroin that caused Victim's death was sold to CW-1 by Pedro BAEZ (hereinafter, "PEDRO").

5.     The investigation revealed that PEDRO was responsible for distributing a heroin and fentanyl mixture, cocaine, and crack cocaine to approximately 20 customers throughout the Fitchburg, Massachusetts area. Most of the customers were drug users, but many of the customers resold all, or a portion, of the drugs they bought from the drug trafficking organization (hereinafter,

---

[1] CW-1 has a criminal history that includes arrests and convictions for drug distribution. CW-1 is a recovering drug addict and is cooperating in this investigation in an effort to avoid criminal charges, or to receive consideration in connection with those charges. Agents have corroborated the information provided by CW-1 to the extent possible through surveillance and through audio and video recordings of the controlled purchases CW-1 participated in. These recordings further corroborate the information provided by CW-1, and I believe the information provided by CW-1 to be reliable. CW-1 is a testifying cooperator.

the "DTO") to their own customers.    In the course of the investigation, agents learned that PEDRO led the DTO in coordination with his son, ANTHONY.    ANTHONY obtained narcotics directly from PEDRO, or from suppliers they mutually used.    ANTHONY had his own drug customers, but there were some customers that both ANTHONY and PEDRO sold drugs to.

6.    Agents also learned that ANTHONY worked directly with Monica TROCHE (hereinafter, "TROCHE") to store, package, and distribute narcotics.    ANTHONY used TROCHE to drive him to drug deals.    In addition, TROCHE often sold drugs at ANTHONY's direction or independently to customers of her own.

7.    Beginning in July 2019, United States District Court Judges for the District of Massachusetts issued orders pursuant to Title III authorizing the interception of wire and electronic communications to and from telephones used by members of the DTO and its suppliers, including two telephones used by ANTHONY (Target Telephones 1 and 2), two telephones used by PEDRO (Target Telephones 4 and 5), a telephone used by VIDARTE (Target Telephone 3), a telephone used by PAREDES (Target Telephone 6), a telephone used by FIGUEROA (Target Telephone 7), and two telephones used by VILLOT-SANTIAGO (Target Telephones 8 and 9).  *See* 19-91283-WGY.

8.    Through the Title III interceptions, related physical surveillance, and controlled purchases, agents were able to identify multiple sources of drug supply utilized by the DTO. Based on the investigation, agents identified VIDARTE as a heroin/fentanyl supplier to the DTO. Interceptions over VIDARTE's phone, in connection with surveillance and controlled purchases, led agents to identify PAREDES as VIDARTE's source of heroin/fentanyl supply.    Over the course of the investigation, agents identified MARTINEZ and FIGUEROA as sources of cocaine and crack cocaine to the DTO.    Based on interceptions over FIGUEROA's phone, agents

4

identified VILLOT-SANTIAGO as FIGUEROA's cocaine supplier. Agents subsequently received authorization to intercept VILLOT-SANTIAGO's telephones. Based on interceptions over VILLOT-SANTIAGO's telephones, agents identified TORRES as a "runner" for VILLOT-SANTIAGO, who both delivered drugs to customers on behalf of VILLOT-SANTIAGO, and also collected drug proceeds from VILLOT-SANTIAGO's customers. Agents also identified JONATHAN, who is VILLOT-SANTIAGO's brother. Over the course of the investigation, agents learned that JONATHAN worked with his brother to obtain cocaine, that they utilized the same locations to store, manufacture, and package cocaine and crack cocaine, and to store drug proceeds. Agents learned that JONATHAN also utilized TORRES as a runner to deliver drugs to customers on behalf of JONATHAN.

9.     In addition to the Title III interceptions, agents utilized four separate cooperating witnesses to conduct controlled purchases from the DTO. Over the course of the investigation, agents seized over 1.8 kilograms of a mixture of heroin and fentanyl, over 3.6 kilograms of cocaine, over 50 grams of crack cocaine, a stolen, loaded handgun, drug manufacturing equipment, and over $376,000 in U.S. currency.

## Controlled Purchases from ANTHONY

10.     Between January 17, 2019 and March 27, 2019, CW-1 completed three controlled drug purchases from the ANTHONY. CW-1 coordinated the deals through recorded telephone calls with ANTHONY. ANTHONY also personally delivered the drugs to CW-1 during each of the controlled purchases. Prior to meeting with ANTHONY, agents searched CW-1 for drugs and personal money, with negative results. Each of the deals was also audio and video recorded. All of the drugs purchased from ANTHONY were all submitted to the DEA Northeast Regional Laboratory for testing. The laboratory results confirm that CW-1 purchased a total of

approximately 15.3 grams of fentanyl and heroin, as well as approximately 9.3 grams of crack cocaine, from ANTHONY. At the direction of agents, CW-1 told ANTHONY about a friend who was in the drug business and who liked ANTHONY's product and wanted to buy larger quantities from ANTHONY. That "friend" was actually another cooperating witness (hereinafter, "CW-2").[2]

11. At the direction of agents, CW-2 contacted ANTHONY to arrange to purchase heroin. Between March and October 2019, CW-2 participated in eight controlled purchases from ANTHONY and other members of the DTO. As with CW-1, CW-2 coordinated the deals through recorded telephone calls with ANTHONY. For each of the controlled purchases, prior to meeting with ANTHONY, agents searched CW-2 for drugs and personal money, with negative results. Each of the deals was also audio and video recorded. All of the drugs purchased from the DTO were all submitted to the DEA Northeast Regional Laboratory for testing. The results confirm that all of the "heroin" CW-2 purchased from the DTO was actually a mixture containing both heroin and fentanyl. In total, CW-2 purchased approximately 1.6 kilograms of a fentanyl and heroin mixture and approximately 1 kilogram of cocaine from the DTO.

### *July 17, 2019 – Controlled Purchase of 150 Grams of Heroin/Fentanyl Mixture*

12. On July 17, 2019, CW-2 conducted a controlled purchase of 150 grams of "heroin"[3]

---

[2] CW-2 has been cooperating with the FBI since April 2018. CW-2 has also provided assistance to the DEA and the Quincy Police Department. CW-2 has a criminal history that includes multiple arrests for drug distribution offenses, among others. CW-2 has provided information that has resulted in multiple drug seizures and arrests. CW-2 is participating in the investigation for both monetary, immigration benefits, and consideration on criminal charges related to identity theft. Agents have corroborated the information provided by CW-2 to the extent possible through surveillance and through audio and video recordings of the controlled purchases CW-2 participated in. These recordings further corroborate the information provided by CW-2, and I believe the information provided by CW-2 to be reliable. CW-2 is a testifying cooperator.

[3] As noted above, for each of the controlled purchases in which a CW ordered "heroin" the substance actually contained a mixture of heroin and fentanyl, with one exception when the substance contained fentanyl, but not heroin.

from ANTHONY and TROCHE. ANTHONY and CW-2 agreed to meet in Watertown to complete the deal. Agents observed ANTHONY drive with TROCHE to A&R Towing on Summer Street in Fitchburg (hereinafter, the "Garage"), which agents identified as a garage where VIDARTE worked. After being at the Garage for a short period of time, agents observed ANTHONY and TROCHE drive to the Home Depot in Watertown to complete the controlled purchase with CW-2. A little over an hour after the deal between CW-2 and ANTHONY, agents observed ANTHONY arrive back at the Garage, go inside the building and then leave approximately five minutes later. Agents sent the substance purchased from ANTHONY to the DEA Northeast Regional Laboratory; the results confirm the substance to be 150.1 grams of a substance containing heroin and fentanyl. Based on my training and experience, and the investigation, I believe that ANTHONY obtained the heroin/fentanyl mixture that he sold to CW-2 on July 17, 2019 from VIDARTE on credit, and that ANTHONY paid VIDARTE for the drugs after the deal was complete.

*August 21, 2019 – Controlled Purchase of 200 Grams of Heroin/Fentanyl Mixture*

13.     In mid-August 2019, CW-2 made arrangements with ANTHONY for another controlled purchase of "heroin." On August 14, 2019, agents intercepted a call between ANTHONY and VIDARTE, during which ANTHONY asked if VIDARTE could "get" him "something" for "the people in Boston." ANTHONY told VIDARTE he did not know how much he needed yet, but that it might be "a hundred and fifty, three hundred." ANTHONY asked VIDARTE how quickly he could get that amount, and VIDARTE responded, "Like half hour." Based on the investigation, I believe that ANTHONY was asking VIDARTE if he could obtain the heroin for the deal with CW-2 ("the people in Boston"). Later that day, CW-2 and ANTHONY confirmed the deal for the following Monday (August 21, 2019). Almost

immediately after the call with CW-2, agents intercepted another call between ANTHONY and VIDARTE, during which ANTHONY told VIDARTE that he "talked to [his] guy" who wanted to do something on Monday, and that ANTHONY needed "seventy five." VIDARTE confirmed, and ANTHONY told VIDARTE he would call him on Monday morning to remind him and let him know if the amount changed.

14. On the morning of August 21, 2019, agents intercepted a text message from ANTHONY to VIDARTE asking him to call him.[4] Agents observed VIDARTE arrive at the Garage, then intercepted a call, during which ANTHONY told VIDARTE he would be there in two minutes. A few minutes later, agents observed ANTHONY and TROCHE arrive at the Garage. Agents observed ANTHONY carrying a medium sized white object, which appeared to be a bag with a towel over it. ANTHONY and TROCHE drove across the street from the Garage to a business plaza and appeared to meet with someone on a tan sedan for about fifteen minutes. ANTHONY and TROCHE then drove to meet with CW-2 to complete the controlled purchase for 200 grams of heroin/fentanyl. As ANTHONY and TROCHE were driving back to Fitchburg, agents intercepted a call from ANTHONY to VIDARTE, during which ANTHONY told VIDARTE that he was five minutes away. Agents then intercepted a series of calls between ANTHONY and VIDARTE discussing where to meet. Agents observed ANTHONY and VIDARTE meet in the parking lot of the S&S Lobster restaurant. Laboratory results confirm the substance ANTHONY sold to CW-2 to be approximately 198 grams of a substance containing both fentanyl and heroin. Based on my training and experience, and the investigation, I believe

---

[4] There was a system malfunction and agents were unable to intercept any calls for about 5 hours that day. Surveillance observed ANTHONY and TROCHE go to PEDRO's house, then go to the Garage. Once they got to the Garage, the interceptions were working again for ANTHONY's phone. Agents were not intercepting PEDRO or VIDARTE's phones at this time.

that ANTHONY obtained at least 75 grams of the heroin/fentanyl mixture that he sold to CW-2 on August 21, 2019 from VIDARTE on credit, and that ANTHONY paid VIDARTE for the drugs after the deal was complete.

### *September 24, 2019 – Controlled Purchase of 500 Grams of Heroin/Fentanyl Mixture and 500 Grams of Cocaine*

15.     In mid-September 2019, at the direction of agents, CW-2 made a series of recorded calls to ANTHONY to arrange to purchase 500 grams of heroin and 500 grams of cocaine.   CW-2 told ANTHONY that the cocaine was for CW-2's friend.   In fact, CW-2's friend was another cooperating witness (hereinafter, "CW-3").[5]   ANTHONY and CW-2 planned to conduct the deal on September 24, 2019, and made arrangements to meet at a hotel in Watertown, Massachusetts. At the time of this controlled purchase, agents were intercepting a telephone used by ANTHONY (Target Telephone 2),[6] a telephone used by PEDRO (Target Telephone 4), as well as a telephone used by VIDARTE (Target Telephone 3).   As will be detailed below, intercepted calls and surveillance indicate that ANTHONY obtained the heroin/fentanyl mixture from VIDARTE, who obtained the drugs from PAREDES, and that ANTHONY and PEDRO obtained the 500 grams of cocaine from FIGUEROA.

---

[5] CW-3 has been cooperating with the FBI since August 2018.   CW-3 was previously arrested for distribution of controlled substances and charged in Massachusetts state district court.   CW-3 initially cooperated with the FBI in hopes that CW-3 would receive a lesser sentence for charges related to that arrest.   CW-3 later did receive consideration on the state charge and the case was dismissed.   CW-3 has no other criminal record.   Since September 2018, CW-3 has cooperated with the FBI in exchange for monetary compensation.   Cooperation by CW-3 has resulted in at least three arrests and the seizure of large quantities of heroin, fentanyl, and cocaine.   CW-3 began cooperating in this investigation in September 2019.   CW-3 is a testifying cooperator.

[6] At the time of this controlled purchase, agents were intercepting a second telephone used by ANTHONY (Target Telephone 2), but were no longer intercepting the telephone that CW-2 used to communicate with ANTHONY (Target Telephone 1).   The calls between CW-2 and ANTHONY over Target Telephone 1 were not intercepted, but were recorded.

16.     On September 17, 2019, CW-2 made a recorded call to ANTHONY, during which they discussed the upcoming deal.  During that call, ANTHONY told CW-2 that he would "let [his] man" know to order the cocaine and would have the heroin "on deck" for the deal.  Later that day, agents intercepted a call over Target Telephone 4 between PEDRO and ANTHONY, during which they discussed meeting in person.  Based on the timing of this call, I believe ANTHONY went to see PEDRO in person to discuss the drug deal ANTHONY had just negotiated with CW-2.

17.     On September 23, 2019, CW-2 made a recorded call to ANTHONY to confirm the deal.  Approximately twenty minutes after that call, agents intercepted a call between ANTHONY and VIDARTE, during which ANTHONY told VIDARTE, "I need that, uh, thing that we talked about tomorrow morning."  VIDARTE asked ANTHONY, "How much?" and ANTHONY responded, "200."  They agreed that VIDARTE would have it around "9, 9:30."  Based on this conversation, I believe ANTHONY requested 200 grams of heroin ("200") from VIDARTE.  VIDARTE confirmed ANTHONY's order and agreed to meet ANTHONY around 9:00 or 9:30 the next morning (September 24, 2019).  As discussed below, I believe ANTHONY obtained 200 grams of a heroin/fentanyl mixture from VIDARTE the following morning.  I believe ANTHONY then mixed the 200 grams of a heroin/fentanyl mixture with 300 grams of cutting agents to make 500 grams to sell to CW-2.

18.     Approximately fifteen minutes after the call with VIDARTE, agents intercepted a call between PEDRO and ANTHONY, during which ANTHONY asked PEDRO if he could get the 500 grams of cocaine for the deal with CW-2.  PEDRO told ANTHONY that he needed to "text some people" to see "if they have it on deck."  Based on this exchange, I believe PEDRO had more than one cocaine supplier.  During this call, ANTHONY told PEDRO that "Pelau" was

"getting it for [him] tonight too."   Based on other intercepted calls, I know that "Pelau" is a moniker frequently used by members of the DTO when referring to VIDARTE, and I believe ANTHONY was telling PEDRO that he already arranged to get the "heroin" from VIDARTE. Later that day, agents intercepted another call between PEDRO and ANTHONY confirming that ANTHONY needed 500 grams ("not the whole, it's the half") of cocaine.   Call records indicate that PEDRO called FIGUEROA later that evening.[7]

19.     On September 24, 2019, at approximately 8:38 a.m., agents intercepted a call between ANTHONY and VIDARTE, during which ANTHONY asked VIDARTE to let him know when he was ready to meet.   VIDARTE told ANTHONY to wait 10 or 15 minutes.   I believe ANTHONY called VIDARTE to obtain the 200 grams of "heroin" ANTHONY requested from VIDARTE the day before.

20.     Immediately after the call with ANTHONY ended, agents intercepted a call between VIDARTE and PAREDES.   The conversation, conducted in Spanish, was translated by Spanish linguist monitors.   During the call, PAREDES agreed to meet VIDARTE at "the shop."[8] About 20 minutes later, agents observed a grey Honda Pilot park within the fenced in area of the Garage.   The Honda Pilot was registered to PAREDES.   Agents observed VIDARTE meet with a male driver, believed to be PAREDES, and a female passenger in the Honda Pilot.   About 10 minutes later, agents observed the Honda Pilot depart from the Garage.

21.     At approximately 8:47 a.m., agents intercepted a call between ANTHONY and PEDRO, during which they discussed PEDRO obtaining the cocaine for ANTHONY.   Shortly

---

[7] At the time, agents were not intercepting FIGUEROA's phone, nor were agents intercepting the telephone PEDRO used to call FIGUEROA.

[8] I believe the reference to "the shop" is a reference to the Garage.

after that call, telephone records indicate that PEDRO called FIGUEROA, and then FIGEROA called PEDRO. Following those calls, agents intercepted another call between PEDRO and ANTHONY, during which PEDRO told ANTHONY, "Ricky's gonna let me know right now, with his people, see how much." Based on the intercepted calls and telephone records, I believe that "Ricky" is Ricky FIGUEROA.

22. At approximately 9:10 a.m., agents intercepted a call between VIDARTE and ANTHONY, during which VIDARTE told ANTHONY, "Your car is ready." ANTHONY replied that he would be at the Garage soon. Based on this call, and the call and surveillance of VIDARTE and PAREDES described above, I believe VIDARTE obtained 200 grams of a heroin/fentanyl mixture from PAREDES, and that VIDARTE used coded language, "your car is ready," to let ANTHONY know that he could come to pick up the drugs. Over the course of the investigation, I believe VIDARTE regularly used the phrase, "your car is ready," to indicate that the drugs were ready to be picked up.

23. At approximately 10:02 a.m., agents conducting surveillance observed ANTHONY depart from PEDRO's residence at 54-56 Nashua Street in Fitchburg. Agents observed ANTHONY drive to the Garage where he met with VIDARTE. ANTHONY returned to his vehicle, removed an item from his shorts pocket, and placed the item in the trunk area of the van. Agents later intercepted a text message sent from VIDARTE to ANTHONY, which stated, "How is everything you okay." ANTHONY replied back, "Yes just took off on my way out there be back soon." I believe that in these text messages, ANTHONY informed VIDARTE of his intention to re-sell the drugs VIDARTE supplied him with to CW-2 and VIDARTE was checking in to make sure the deal was going as planned.

24.     At approximately 10:57 a.m., telephone records indicate that FIGUEROA called PEDRO.  Approximately ten minutes later, agents intercepted a call between ANTHONY and PEDRO, during which PEDRO told ANTHONY, "Ricky's gotta go get it, but I have to have Amanda go wake up Junior cause that's where my money's at… But Ricky said he'll do it right now."   Based on these calls and the toll records, I believe that PEDRO spoke with FIGUEROA and that FIGUEROA told PEDRO that he would get the 500 grams of cocaine.   PEDRO then told ANTHONY that FIGUEROA ("Ricky") was getting the cocaine for ANTHONY.

25.     Call records indicate that FIGUEROA called PEDRO at approximately 11:45 a.m. Shortly thereafter, agents observed FIGUEROA meet with PEDRO in front of PEDRO's residence.  After a brief conversation, agents observed FIGUEROA walk away from PEDRO carrying something in his hand, and depart the area in a Jeep Cherokee.  Approximately thirty minutes later, agents intercepted a call between PEDRO and ANTHONY, during which PEDRO told ANTHONY, that he was "gonna go pick it up" and that "he already left with the dough." PEDRO told ANTHONY, "He just told me twenty minutes."   Based on these calls, the toll records, and surveillance observations, I believe that FIGUEROA told PEDRO that he was coming to collect the money ("dough") for the 500 grams of cocaine.   I believe agents then observed FIGUEROA meet with PEDRO to pick up the money for the 500 grams of cocaine.   During the subsequent call with ANTHONY, PEDRO informed ANTHONY that FIGUEROA came to get the money ("He already left with the dough"), and that FIGUEROA told PEDRO he would have the cocaine in 20 minutes ("He just told me twenty minutes.").

26.     At approximately 12:44 p.m., agents intercepted a call between PEDRO and ANTHONY, during which ANTHONY was checking on the status of the cocaine.   PEDRO told ANTHONY he would call and ask, since he knew that ANTHONY had to go.   ANTHONY told

PEDRO that he already had the heroin ("I got that shit already taken care of"). Immediately after that call ended, telephone records indicate that PEDRO called FIGUEROA. I believe that PEDRO made this call to ask FIGUEROA when the cocaine would be ready.

27. At approximately 12:51 p.m., agents intercepted a call between PEDRO and ANTHONY. During that call, PEDRO told ANTHONY, "(UI) go pick it up. All set." At the same time, agents conducting surveillance observed ANTHONY arrive at 54-56 Nashua Street (PEDRO's residence). Agents simultaneously intercepted another call between ANTHONY and PEDRO, during which ANTHONY told PEDRO to come out to the porch. Minutes later, ANTHONY changed vehicles and left the area. Surveillance agents were unable to follow ANTHONY. Though agents did not observe ANTHONY meet with FIGUEROA, based on PEDRO telling ANTHONY to "go pick it up," and subsequent events discussed later, I believe ANTHONY stopped to meet FIGUEROA to pick up 500 grams of cocaine before driving to Watertown to meet with CW-2.

28. Agents conducted surveillance of ANTHONY as he made stops at TROCHE's residence and PEDRO's residence. Based on other intercepted calls and surveillance observations, I believe ANTHONY took the 200 grams of a heroin/fentanyl mixture he obtained from VIDARTE and mixed it with a combination of cutting agents to make 500 grams of "heroin" for CW-2. In addition, based on the calls described above, I believe that after PEDRO told ANTHONY to "go pick it up. All set," that ANTHONY met with FIGUEROA to obtain the 500 grams of cocaine, before traveling with TROCHE from Fitchburg to Watertown to meet with CW-2 and CW-3.

29. Prior to the meeting with ANTHONY, agents searched CW-2 and CW-3 for drugs and personal money, with negative results. Agents provided CW-2 with $45,500 in official

agency funds and activated covert audio and video recording equipment inside the hotel room. Agents monitored a real-time audio and video transmission from outside the room during the entire operation. At approximately 2:35 p.m., agents observed ANTHONY and TROCHE arrive at the hotel, remove items from behind the backseat, and go into the hotel. Minutes later, ANTHONY and TROCHE went into the hotel room and completed the transaction for 500 grams of "heroin" and 500 grams of cocaine, in exchange for $45,500 from CW-2 and CW-3. Immediately after ANTHONY and TROCHE left the room, agents went into the room to retrieve the drugs and recording devices. Laboratory reports confirm the suspected heroin to be approximately 498.1 grams of a substance containing heroin and fentanyl, and the suspected cocaine to be 499.8 grams of cocaine.

30. Agents conducted surveillance of ANTHONY and TROCHE as they departed the hotel. Agents observed ANTHONY and TROCHE travel to a Target store and go inside for a brief period of time. After they left the Target store, at the request of agents, Watertown Police officers conducted a traffic stop of ANTHONY and TROCHE before they left Watertown. During that stop, officers seized all but $281 of the $45,500 in official agency funds from ANTHONY. Officers issued TROCHE a warning for failing to signal a lane change, and then released TROCHE and ANTHONY from the scene. ANTHONY lied to the officer and stated that the money was for a car that he planned on purchasing.

31. Immediately after officers released ANTHONY and TROCHE from the traffic stop, agents intercepted a call between ANTHONY and PEDRO during which ANTHONY told PEDRO about being pulled over and the police taking the money. PEDRO told ANTHONY, "Just come and talk to me over here." About an hour and a half later, agents intercepted another

call between ANTHONY and PEDRO, during which ANTHONY told PEDRO he was outside the house.

32.     Later on the night of September 24, 2019, at approximately 6:40 p.m., an hour after agents believe ANTHONY met with PEDRO, agents intercepted a call between ANTHONY and VIDARTE during which ANTHONY asked VIDARTE to come see him in person.   VIDARTE agreed to meet ANTHONY at ANTHONY's house in 20 minutes.   About 40 minutes later, agents intercepted another call between ANTHONY and VIDARTE, during which VIDARTE said he was at the house.   ANTHONY instructed VIDARTE to go upstairs to talk with his father.   Based on the next call, I do not believe PEDRO was at home.

33.     At approximately 7:29 p.m., agents intercepted a call from VIDARTE to PEDRO. The conversation was conducted in Spanish and translated by Spanish linguist monitors.   During the call, VIDARTE told PEDRO, "I wanted you to take care of things calmly" and he asked PEDRO if he had the money.   PEDRO told him he did not, and that he lost money in the deal too. VIDARTE told PEDRO that he could not do anything, and that, "those people are not going to understand.   You are risking my life and my family's."   Based on this portion of the call, I believe that VIDARTE obtained the 200 grams of heroin/fentanyl that he provided to ANTHONY on credit from PAREDES.   I believe VIDARTE was scared and upset because he needed to pay PAREDES back and he did not have the money.   At the end of the call, VIDARTE told PEDRO that he would wait to talk with the people he owes the money to until PEDRO and ANTHONY figure out a way to pay the money they owed VIDARTE.

34.     The next day agents intercepted a call between PEDRO and VIDARTE at approximately 9:04 a.m., during which VIDARTE questioned whether ANTHONY was lying about the police taking the money.   PEDRO assured VIDARTE that ANTHONY was telling the

truth, and told VIDARTE that he would help pay off ANTHONY's debt because he wanted to continue doing business with VIDARTE's suppliers. PEDRO told VIDARTE, "I want to help him pay that because I want him to continue with the people because if I don't get that shit, I can't make dough." PEDRO commented that he lost $18,000 of his own money when ANTHONY was stopped. Later in the conversation PEDRO told VIDARTE, "If he gives me a chance, in like 10 days, you know what I mean? If I can continue with the cocaine then I'll have dough to buy it." I believe PEDRO informed VIDARTE that he intended to sell cocaine to help pay off ANTHONY's debt to VIDARTE's suppliers. VIDARTE said he would "talk to him" and would see what happens. I believe when VIDARTE said "talk to him" he meant that he would talk with his supplier, PAREDES. Over the next two hours agents intercepted four additional calls between PEDRO and VIDARTE. During each of the calls, PEDRO updated VIDARTE about collecting money to pay VIDARTE.

35. At approximately 10:52 a.m., agents intercepted a text message sent from VIDARTE to PAREDES. The message, translated from Spanish to English, stated, "Hello, bro, I think they lied to me, he said that he was stopped because of a stop, and they checked and they found/took the money." Minutes later, agents intercepted two more text messages from VIDARTE to PAREDES. The messages stated that VIDARTE was not happy and that VIDARTE wanted to meet to discuss what they were going to do. Based on the prior calls between VIDARTE and PEDRO discussed above, I believe that VIDARTE was telling PAREDES that he thought ANTHONY was lying about the police taking the money ("I think they lied to me, he said that he was stopped… and they found/took the money").

36. At approximately 10:53 a.m., agents intercepted a reply text message from PAREDES to VIDARTE. The message, translated from Spanish to English, stated, "Of course,

have to do something." About a minute later, agents intercepted a call from PAREDES to VIDARTE. The conversation between PAREDES and VIDARTE was conducted in Spanish and translated by Spanish linguist monitors. During the call, VIDARTE told PAREDES that he was suspicious about ANTHONY really being stopped by the police. VIDARTE said the person responsible for losing the money is "Pedro's son, the old man that always buys from me, it's his son." I believe that in the text message PAREDES was agreeing with VIDARTE that they needed to "do something" about ANTHONY owing them money. I also believe that during the call described above, VIDARTE explained to PAREDES that he regularly supplies PEDRO with narcotics ("that old man that always buys from me"), and that it was PEDRO's son who lost or took the money.

37.     During the same conversation, PAREDES told VIDARTE, "No, you tell him, '*Listen, listen, get me…get me that money.*' You tell him, '*Hey, get me that dough. Those people are asking.*'" VIDARTE replied, "I said to him, '*He knows where I live, he know where I work.*' I told him that I don't lie to people and that's why we get along just fine." PAREDES ended the conversation by telling VIDARTE that he would come to see VIDARTE. I believe that during this call PAREDES was advising VIDARTE what to say to PEDRO ("you tell him…") regarding the money that ANTHONY owed VIDARTE ("*get me that money*").

38.     At approximately 2:15 p.m., agents intercepted a call from VIDARTE to PEDRO. The conversation was conducted in Spanish and translated by Spanish linguist monitors. PEDRO told VIDARTE that he had $7,000 and was waiting for ANTHONY to bring him another $1,000. PEDRO told VIDARTE, "You know, we will give them eight and it's set. When we give them eight, it will be over and done with?" VIDARTE replied, "Yes, I see…it's the only way I was

able to fix that for you and for me to not get into trouble." Based on this call, I believe VIDARTE agreed that if PEDRO paid him $8,000, he would consider ANTHONY's debt paid.

39. At approximately 3:58 p.m., agents intercepted another call between VIDARTE and PEDRO, during which PEDRO told VIDARTE that he had the money and could bring it to VIDARTE the following day. VIDARTE replied that he would come to pick up the money from PEDRO when he got off work. During that call, PEDRO also asked VIDARTE if he could get him "at least 50." PEDRO told VIDARTE that he would "pay it in three days." VIDARTE responded, "Let me give him the dough so that he sees and, after that, I'll ask him for it." Based on this portion of the call, I believe that PEDRO asked VIDARTE to give him 50 grams of heroin ("50") on credit. PEDRO offered to pay for the drugs in three days. VIDARTE told PEDRO that he would ask "him" for the drugs after paying off ANTHONY's debt. Based on the calls, I believe VIDARTE meant that he would ask PAREDES ("him") for the 50 grams of heroin. Agents intercepted calls later the same night indicating that VIDARTE went to PEDRO's house to collect the $8,000 to pay off ANTHONY's debt.

40. Approximately 30 minutes after intercepting a call indicating that VIDARTE arrived at PEDRO's house to collect money, agents intercepted a call from VIDARTE to PAREDES. During that call, VIDARTE told PAREDES that he went to PEDRO's house and "told him everything you told me to." VIDARTE told PAREDES that PEDRO gave him "five," and that PEDRO asked VIDARTE to help him out with "50" so he could "work." I believe that "five" was a reference to $5,000, and I am unsure if PEDRO only gave VIDARTE $5,000 or if PEDRO gave him $8,000 and VIDARTE kept $3,000 for himself. As previously stated, I believe "50" was a reference to 50 grams of heroin for PEDRO. I believe "work" means to sell drugs. PAREDES replied, "That's fine." PAREDES further stated that VIDARTE should no longer sell

19

to ANTHONY, but should still supply PEDRO. PAREDES told VIDARTE, "I'm going to stop by tomorrow early, and I'll give you that, you hear?" During this call, I believe that PAREDES told VIDARTE that he would bring VIDARTE the 50 grams of heroin ("that") the following morning so that VIDARTE could distribute it to PEDRO.

41.     About seven minutes after the call with PAREDES ended, agents intercepted a text message over from VIDARTE to PEDRO. The message, roughly translated from Spanish to English, stated, "For tomorrow, he said you can count on him for anything." I believe VIDARTE sent this message to PEDRO to let PEDRO know that PAREDES agreed to let VIDARTE sell PEDRO 50 grams of heroin on credit.

*October 23, 2019 – Controlled Purchase of 500 Grams of Heroin/Fentanyl Mixture and 500 Grams of Cocaine*

42.     In October 2019, CW-2 arranged for another controlled purchase of 500 grams of heroin and 500 grams of cocaine from ANTHONY. In advance of the deal, agents intercepted a series of calls between PEDRO and various sources of drug supply, during which he worked to obtain the 500 grams of heroin and 500 grams of cocaine for ANTHONY to sell to the CWs.

43.     On October 22, 2019, at approximately 6:44 p.m., agents intercepted a call between PEDRO and VIDARTE, during which PEDRO and VIDARTE discussed VIDARTE supplying PEDRO with heroin for the planned deal with CW-2. As discussed above, ANTHONY owed a large debt to VIDARTE after agents seized the money following a controlled purchase, and as a result, VIDARTE was hesitant to supply ANTHONY again. During this call, PEDRO assured VIDARTE that he would take responsibility for making sure that VIDARTE got paid for the drugs he supplied them.

44.     Later the same day, at approximately 9:43 p.m., agents intercepted a call between

PEDRO and an unknown male identified only as "Squirt" (hereinafter, "Squirt"), during which PEDRO asked Squirt if he could supply him with 500 grams of powder cocaine ("that dude that buys half every month from me, he's coming tomorrow at 11."). PEDRO told Squirt, "But you don't have to cook this… he doesn't take it cooked… just wants it in powder, that's what he takes it every time in powder." Squirt responded, "I'm gonna call my people right now… And I'll have it ready for you in the morning." I believe that during this call PEDRO was ordering the 500 grams of cocaine ("half" "in powder") so that ANTHONY could sell it to CW-2 ("that dude that buys half every month") the following day. I believe that Squirt confirmed that he would call his supplier ("my people") and that he would have the 500 grams of powder cocaine ready for PEDRO the following morning.

45. The next day, October 23, 2019, at approximately 9:06 a.m., agents intercepted a call between PEDRO and VIDARTE, during which they discussed whether VIDARTE was able to obtain the heroin to supply PEDRO for the deal with CW-2. VIDARTE told PEDRO that his source of supply told him he would call that day, but that he had not called yet. PEDRO told VIDARTE that he would need "it" before 11, and that if VIDARTE was not able to get the heroin by that time, that PEDRO would "get it elsewhere." VIDARTE told PEDRO that he would "call him and find out." Approximately ten minutes later, agents intercepted another call between PEDRO and VIDARTE, during which PEDRO said he would pay for half of the drugs up front. VIDARTE told PEDRO that "half" would be $7,000. Agents then intercepted another call between PEDRO and VIDARTE, during which PEDRO told VIDARTE that he had "6,000 bucks" and "200 in rocks," indicating that PEDRO would be able to cover the cost if anything happened. PEDRO asked if VIDARTE's supplier would agree to that in exchange for the heroin. PEDRO further told VIDARTE that the customer would be coming to his house for the deal and that

VIDARTE could come to the house immediately after the deal to retrieve the money. VIDARTE agreed to check with his supplier.

46. At approximately 9:57 a.m., agents intercepted a call between PAREDES and VIDARTE, during which they discussed the possible sale of heroin to PEDRO. VIDARTE told PAREDES that PEDRO would pay for half, and the two agreed to talk in person. Shortly thereafter, agents intercepted a call between PEDRO and VIDARTE, during which PEDRO asked VIDARTE whether VIDARTE's supplier would agree to the deal. PEDRO told VIDARTE that he had "another guy too just in case." VIDARTE told PEDRO that he was going to meet with his supplier and that he would call PEDRO to let him know whether they would agree to the deal.

47. At approximately 10:15 a.m., at the direction of agents, CW-2 called ANTHONY to confirm that CW-2 was driving to Fitchburg. Telephone records indicate that immediately following that call, ANTHONY called PEDRO.

48. At approximately 10:24 a.m., agents intercepted a call between PEDRO and VIDARTE, during which PEDRO told VIDARTE to "forget about it" because his "son called" and "those people are already on their way." PEDRO went on to tell VIDARTE that "they give it to me right away, because my son needs it right now. Because they are coming. Those people are on their way now. And I need to prepare it." VIDARTE responded, "Oh yes, yes, grind it and all that." Based on this call, and the telephone records, I believe that ANTHONY called PEDRO to tell him that CW-2 was heading to Fitchburg, and that PEDRO found another source of heroin supply who could get him the drugs immediately ("they give it to me right away"). I further believe that PEDRO planned to add cut or diluting product to the heroin before selling it to CW-2 ("I need to prepare it").

49. At approximately 10:30 a.m., agents intercepted a call between PEDRO and Branny

TAVERAS (hereinafter, "TAVERAS").   During that call, PEDRO asked TAVERAS, "Are you going to be able to get me that?"   TAVERAS responded, "Yes, yes, of course, of course." PEDRO told TAVERAS that he would "pick it up right away" because his customers were "coming from Boston now."   TAVERAS responded, "That's fine, give me, give me about an hour, okay?"   Based on the intercepted calls, I believe that PEDRO called TAVERAS to order the heroin, since VIDARTE could not get it quickly enough for him.   TAVERAS told PEDRO he could get the heroin for him in an hour.

50.     Shortly thereafter, at approximately 10:38 a.m., agents intercepted a call between PEDRO and Squirt.   During that call, Squirt told PEDRO that he would "be down there around like 11:30."   PEDRO responded, "Alright, yeah, cause those people are coming right now from Boston."   Based on the other calls intercepted between PEDRO and Squirt, I believe that they were discussing Squirt supplying PEDRO with 500 grams of cocaine for PEDRO to distribute to CW-2 and CW-3 ("those people… coming right now from Boston").

51.     About ten minutes later, CW-2 received instructions from ANTHONY to meet him close to his house, and that they would go to his house to conduct the transaction.   Agents searched CW-2 and CW-3, as well as their vehicle, for money or contraband, with negative results.   Both CW-2 and CW-3 were provided with audio/video recording devices.   At approximately 11:17 a.m., agents observed ANTHONY arrive at 54-56 Nashua Street, in Fitchburg.

52.     At approximately 11:30 a.m., agents intercepted a call between PEDRO and Squirt, during which Squirt told PEDRO that he was "waiting for the guy to pull up" and that the "guy" said he would drop it off in 10-15 minutes.   Based on the prior calls, I believe that during this call PEDRO was checking on the status of Squirt arranging for delivery of 500 grams of cocaine.

53.     At approximately 11:34 a.m., agents intercepted a call between PEDRO and

TAVERAS, during which TAVERAS told PEDRO to "give [him] 30 minutes." Based on the prior calls, I believe that during this call PEDRO was checking on the status of the delivery of heroin, and TAVERAS told PEDRO he would get the heroin in 30 minutes.

54. At approximately 11:43 a.m., CW-2 received a call from ANTHONY, during which ANTHONY told CW-2 he would be waiting outside for them to arrive. Telephone records indicate that immediately after that call, ANTHONY called PEDRO. Based on the calls, I believe that ANTHONY was calling PEDRO to check on the status of receiving the cocaine and heroin for the deal with CW-2 and CW-3.

55. At approximately 11:45 a.m., agents intercepted a call between PEDRO and Squirt, during which Squirt told PEDRO he was still waiting for his "guy to pull up." PEDRO told Squirt that "these people coming off the highway right now." Squirt told PEDRO that his source was coming from Leominster. PEDRO confirmed the price at "34," and Squirt agreed. I believe that PEDRO was confirming that the purchase price was for $34,000 for a kilogram of cocaine, half of which he would be selling to the CWs.

56. At approximately 11:58 a.m., CW-2 and CW-3 arrived at 54-56 Nashua Street, met with ANTHONY and went inside the first floor unit. Shortly thereafter, at approximately 12:04 p.m., agents intercepted a call between PEDRO and TAVERAS, during which TAVERAS told PEDRO that he was on his way to PEDRO's house and would arrive shortly. PEDRO responded, "the people are already here." I believe PEDRO called TAVERAS to check on the status of the heroin delivery since CW-2 and CW-3 were already at the house ("they people are already here"). I believe that TAVERAS then went to PEDRO's house to deliver the heroin,[9] because shortly

---

[9] Agents did not observe TAVERAS go to PEDRO's house, however, TAVERAS lives at 64 Nashua Street, which is right next door to PEDRO's house at 54-56 Nashua Street, and shares a driveway. As such, I believe that

thereafter, after calling PEDRO, ANTHONY left the first floor apartment, went upstairs, then came back and delivered the 500 grams of heroin to CW-2 in a plastic bag. As ANTHONY handed CW-2 the bag, he stated, "that's the dope," and he told the CWs that his "coke guy" was down the street and bringing it. ANTHONY then went with CW-3 outside to CW-3's vehicle to obtain the money from CW-3.

57. Beginning shortly after 12:00 p.m., agents intercepted a series of calls between PEDRO and Squirt, during which they discussed the delivery of the 500 grams of cocaine. At approximately 12:17 p.m., PEDRO told Squirt that "they're here already." PEDRO told Squirt to let him know if he needed to call someone else. Approximately one minute later, Squirt called PEDRO and stated "this nigga's about to pull up right now, alright?" At approximately 12:25 p.m., Squirt called PEDRO again and stated, "my cousin, yo, the one you see with me, the one with the glasses? He's the one that's gonna go over there, alright?" Based on the calls, I believe that Squirt was sending his cousin who wears glasses to deliver the 500 grams of cocaine.

58. At approximately 12:47 p.m., agents intercepted a call between PEDRO and Kevin MARTINEZ. During that call, MARTINEZ told PEDRO that he was "Squirt's friend," and said he was "heading that way." PEDRO responded, "Yo, you got to hurry up, man. They about to leave, man. They been waiting a while now." Based on the prior calls with Squirt, I believe that MARTINEZ was on his way to deliver the 500 grams of cocaine for Squirt.

59. At approximately 12:56 p.m., agents observed a black Nissan Armada[10] park at the end of the driveway at 54-56 Nashua Street, and observed MARTINEZ exit the driver's side of

TAVERAS walked to PEDRO's house to deliver the heroin.
[10] Agents subsequently learned that the Nissan Armada was owned by Enterprise Rental Car. Agents obtained records from Enterprise, which indicate that MARTINEZ rented the vehicle in his name. Additionally, agents obtained video footage from Enterprise, which shows that MARTINEZ is the individual who rented the vehicle.

the vehicle and walk up to the house carrying a Tommy Hilfiger bag. At the same time, agents intercepted a call between PEDRO and MARTINEZ, during which MARTINEZ asked PEDRO, "where you at?" Video surveillance from the CW vehicle visually captured MARTINEZ walking up to the house carrying the bag. Shortly thereafter, PEDRO went inside the first floor unit and handed CW-3 the same Tommy Hilfiger bag MARTINEZ was observed carrying. The bag contained the 500 grams of cocaine. CW-2 and CW-3 left 54-56 Nashua Street shortly thereafter and proceeded to an agreed upon meeting location to debrief with agents. Laboratory results confirm the suspected heroin to be 504.1 grams of a substance containing heroin and fentanyl. Laboratory results confirm the suspected cocaine to be 498 grams of cocaine.

## VIDARTE and PAREDES

60. In addition, to supplying ANTHONY and PEDRO with a heroin/fentanyl mixture in connection with the controlled purchases, based on interceptions over PEDRO, VIDARTE, and PAREDES's phones, agents estimate that VIDARTE and PAREDES supplied PEDRO with an additional approximately 550 grams of a heroin/fentanyl mixture. Agents regularly intercepted calls between PEDRO and VIDARTE, during which PEDRO ordered "50" from VIDARTE. Based on the investigation, my training and experience, I believe that when PEDRO asked VIDARTE for "50" he was ordering 50 grams of heroin. Almost immediately after each of those calls, agents intercepted calls from VIDARTE to PAREDES ordering the same thing, and subsequently intercepted calls indicating that the deals were completed. Intercepted calls indicate that this occurred at least eleven times between October and November 2019.

61. Based on interceptions over PAREDES's telephone (Target Telephone 6), agents believe that PAREDES also had multiple additional regular drug customers who he supplied with heroin/fentanyl, pills, and cocaine.

## FIGUEROA and VILLOT-SANTIAGO

### *Planned Controlled Purchase in November 2019*

62.      During the month of November 2019, ANTHONY called CW-2 multiple times. On each of the calls, ANTHONY asked CW-2 when CW-2 would be ready to purchase another 500 grams of heroin and another 500 grams of cocaine.

63.      On November 14, 2019, agents intercepted a call between FIGUEROA and ANTHONY, during which ANTHONY asked FIGUEROA, "remember we talked about that thing that I needed to grab, um, my niggas called me from Boston… Can I get that shit for thirty-three?" FIGUEROA responded, "Not for thirty-three.   Thirty four Poppa... That's what I told you last time, thirty-four."   ANTHONY responded, yeah, I'll do thirty-four for the half of thing." FIGUEROA asked ANTHONY if he needed it "right now" and ANTHONY said that he did not need it until Sunday night.   FIGUEROA told ANTHONY, "I got you.   Yeah, just call me a few hours ahead, and I'll have it ready for you."   Based on the investigation, I believe that ANTHONY was ordering the 500 grams of cocaine ("the half of thing") from FIGUEROA, and that they agreed on a price ("thirty-four" or $34,000).   Based on my training and experience, the agreed upon price is what the full kilogram would cost and the agreement for "half" would be for ANTHONY to pay $17,000 to FIGUEROA for 500 grams of cocaine.

64.      On November 15, 2019, agents intercepted a call between FIGUEROA and VILLOT-SANTIAGO, during which FIGUEROA told VILLOT-SANTIAGO, "I was calling because, uh-hum, I need something for Sunday."   VILLOT-SANTIAGO responded, "Yeah, just let me know."   FIGUEROA stated, "Something big, half a thing" and VILLOT-SANTIAGO replied, "Alright, just call me."   They agreed on a price of "thirty-two and a half."   Based on the prior calls, I believe that during this call FIGUEROA ordered the 500 grams of cocaine for

ANTHONY from VILLOT-SANTIAGO ("half a thing") and that VILLOT-SANTIAGO agreed to sell it to FIGUEROA at the rate of $32,500 per kilogram ("thirty-two and a half").

65.    On November 17, 2019, agents intercepted a call between FIGUEROA and ANTHONY during which they discussed the upcoming deal.    During that call, ANTHONY told FIGUEROA that he only had "14" and asked if FIGUEROA would supply him with the 500 grams and ANTHONY would pay him the remaining "3" later.    Based on the prior calls, I believe that during this call ANTHONY was asking FIGUEROA if he could pay $14,000 ("14") up front for the 500 grams of cocaine, and that he pay FIGUEROA the remaining $3,000 ("3") after the deal. FIGUEROA asked if ANTHONY wanted to just wait to pay him until he had all the money following the deal ("You don't wanna just wait until you get it?").    ANTHONY told FIGUEROA he would call him later.

66.    On November 21, 2019, agents executed a search warrant at PEDRO's residence located at 54-56 Nashua Street in Fitchburg.    During that search, among other things, agents found cocaine in a bathroom surrounding the toilet.    It appeared that someone had flushed cocaine down the toilet.    After being advised of his *Miranda* warnings, PEDRO told agents that he saw them coming on his security cameras and that he flushed "half a kilo" of cocaine down the toilet.

### *FIGUEROA Supplied PEDRO with Crack Cocaine Obtained from VILLOT-SANTIAGO*

67.    Prior to PEDRO's arrest, I believe that FIGUEROA supplied PEDRO with large, dealer quantities of crack cocaine that FIGEROA obtained from VILLOT-SANTIAGO.    Between October and November 2019, agents intercepted multiple calls indicating that FIGUEROA supplied PEDRO with 100 grams of crack cocaine on four separate occasions, and that FIGUEROA obtained that crack cocaine from VILLOT-SANTIAGO for each of those deals.

68.    On October 25, 2019, at approximately 1:45 p.m., agents intercepted a call between

FIGUEROA and PEDRO, during which PEDRO asked for "100 of the hard." Later that day, at approximately 4:07 p.m., agents intercepted a call between FIGUEROA and VILLOT-SANTIAGO during which FIGUEROA asked VILLOT-SANTIAGO if he could "bring me 100 of the hard stuff." VILLOT-SANTIAGO agreed and said he would "come by soon." Agents subsequently intercepted calls, which indicate that FIGUEROA and VILLOT-SANTIAGO met, and which indicate that PEDRO and FIGUEROA met thereafter. Based on my training and experience, I know that the term "hard" is commonly used to refer to crack cocaine. I believe that when PEDRO ordered "100 of the hard" from FIGUEROA, and when FIGUEROA subsequently ordered "100 of the hard stuff" from VILLOT-SANTIAGO, they meant 100 grams of crack cocaine.

69.     On October 28, November 2, and November 7, 2019, agents intercepted a series of calls that followed the same pattern as that described above from October 25, 2019. Based on the intercepted calls, I believe that VILLOT-SANTIAGO supplied FIGUEROA with a total of approximately 400 grams of crack cocaine between October 25 and November 7, 2019, which FIGUEROA then supplied to PEDRO.

70.     In addition, agents intercepted several calls that indicate that FIGUEROA had additional drug customers who also appear to be street level dealers. For example, on October 21, 2019, agents intercepted a call during which one of FIGUEROA's customers asked for "100 of hard." FIGUEROA told the customer he would have to "call [his] boy" and call the customer back. Similarly on October 22, 2019, agents intercepted multiple text messages between FIGUEROA and a customer, during which FIGUEROA told the customer that he could "stomp on it like crazy," which I believe to mean that the customer could add a lot of cutting agent before redistributing the product to customers. That same day, FIGUEROA called VILLOT-

SANTIAGO and ordered "100 soft" for his "boy." Calls intercepted later that day indicate that FIGUEROA and VILLOT-SANTIAGO met to complete this transaction. Based on the calls, I believe that FIGUEROA obtained 100 grams of powder cocaine ("100 soft") from VILLOT-SANTIAGO, which FIGUEROA then sold to a customer who planned to further distribute the cocaine to his own customers.

### VILLOT-SANTIAGO and TORRES

71.     Based on interceptions over VILLOT-SANTIAGO's telephones, agents identified a number of regular crack and powder cocaine customers of VILLOT-SANTIAGO who also appear to be street level dealers. The language VILLOT-SANTIAGO and his customers used to discuss drug distribution was not heavily coded. Agents regularly intercepted customers ordering specific quantities like "50" or "100," which I believe to mean 50 grams and 100 grams respectively. Some of VILLOT-SANTIAGO's customers would regularly order either "hard" or "soft," while other customers would order the cocaine, "cheffed" or "undone." Based on my training and experience, the words "hard" or "cheffed" are commonly used to describe crack cocaine, which is created by "cooking" powder cocaine into a rock form. The words "soft" or "undone" are commonly used to describe powder cocaine.

72.     Agents intercepted a number of calls that indicate that VILLOT-SANTIAGO's customers were obtaining cocaine and crack cocaine for further distribution. For example, on November 29, 2019, agents intercepted a call during which VILLOT-SANTIAGO's customer ordered "100 undone," and told VILLOT-SANTIAGO, "If my man like it I'll get 3 more yu hurd." Based on my training and experience, I believe that this customer was telling VILLOT-SANTIAGO that he wanted 100 grams of powder cocaine ("100 undone"), and that if his customers liked it he would order 300 grams more ("If my man like it I'll get 3 more"). The same

day, agents intercepted calls between VILLOT-SANTIAGO and a different customer who told VILLOT-SANTIAGO, "Yo, I some people on deck have the money to buy it," and the customer asked for "50 now" and another "50 later." Based on my training and experience, I believe that the customer was ordering 50 grams of cocaine for his own customer ("I some people on deck have the money to buy it").

73. As noted above, based on interceptions over VILLOT-SANTIAGO's telephones (Target Telephones 8 and 9), as well as surveillance, agents identified TORRES as a "runner" for VILLOT-SANTIAGO. That is, someone who delivered drugs and collected drug proceeds on VILLOT-SANTIAGO's behalf. Over the course of the interceptions, agents intercepted numerous calls during which VILLOT-SANTIAGO would tell customers that he was sending his runner, who he would refer to as "my boy" or "flaco" or "Ivan." Based on the investigation, I believe all of those names are references to TORRES. Following those calls with customers, agents would intercept a call between VILLTO-SANTIAGO and TORRES, during which VILLOT-SANTIAGO would direct TORRES to deliver cocaine and crack cocaine to the customer. For example, on November 23, 2019, agents intercepted a call during which VILLOT-SANTIAGO spoke with a customer who asked if he could "pick up the other 50 of the soft," and VILLOT-SANTIAGO replied, "I'm going to tell this fool to call you shortly." The same day, VILLOT-SANTIAGO called a second customer and told him that his runner would give him "350." Following those calls, agents intercepted a call between VILLOT-SANTIAGO and TORRES, during which VILLOT-SANTIAGO told TORRES to "get three and a half for him – [U/I]; get three and a half for him and give – and fifty for Juan." Based on the prior calls with the two customers, I believe that VILLOT-SANTIAGO was instructing TORRES to deliver 350 grams to one customer, and 50 grams to the other customer. The next day, agents intercepted calls

between TORRES and VILLOT-SANTIAGO discussing TORRES bringing VILLOT-SANTIAGO "the money." Based on the investigation, I believe that TORRES regularly collected drug proceeds from VILLOT-SANTIAGO's drug customers.

74. On December 1, 2019, agents intercepted calls between VILLOT-SANTIAGO and one of his customers who ordered 100 grams of cocaine. VILLOT-SANTIAGO told the customer he would send his "boy" to meet with the customer. Later that day, agents intercepted calls between VILLOT-SANTIAGO and TORRES and VILLOT-SANTIAGO and the customer discussing where the customer should meet TORRES. Agents also intercepted calls during which customers would order cocaine and crack cocaine from VILLOT-SANTIAGO and VILLOT-SANTIAGO would direct the customer to call "Ivan." Agents intercepted multiple text messages in which VILLOT-SANTIAGO passed along TORRES's telephone number to his customers.

75. As another example, on February 18, 2020, agents intercepted a series of text messages between VILLOT-SANTIAGO and one of his regular customers, during which the customer and VILLOT-SANTIAGO discussed the quality of the cocaine that VILLOT-SANTIAGO previously supplied. The customer asked VILLOT-SANTIAGO to supply him with additional cocaine. A short time later, agents intercepted a call between VILLOT-SANTIAGO and TORRES during which VILLOT-SANTIAGO told TORRES to bring the customer, "100 bucks of the soft." Less than one minute later, agents conducting surveillance observed TORRES meet with the customer. After a brief interaction between the two, the customer drove away. At the request of agents, troopers from the Massachusetts State Police conducted a traffic stop of that customer. The troopers observed the man throw a plastic bag out of the driver's side door as he was pulling over. When the trooper approached the vehicle, he observed a torn open plastic bag containing cocaine in the front passenger seat. The cocaine was spilled all over the seat and floor

board. The man was arrested and charged in state district court with possession of cocaine with intent to distribute. Laboratory results confirm the substance to be cocaine with a net weight of 70.4 grams.

76. In the days that followed, agents intercepted multiple calls between VILLOT-SANTIAGO and others, including TORRES, regarding the seizure and how they were "careless." During one such call, VILLOT-SANTIAGO told TORRES that they needed to "take everything out" from their stash house. They further discussed that the area was "hot" due to a recent overdose in the area. VILLOT-SANTIAGO also told TORRES that he needed, "at least three pesos" to sell. Based on my training and experience, I believe that VILLOT-SANTIAGO was asking TORRES to give him 300 grams ("three pesos") of cocaine from their stash house for him to sell.

77. Over the course of the investigation, based on interceptions, surveillance, and the seizure discussed above, I believe that between October 2019 and February 2020, TORRES delivered at least approximately 535 grams of crack cocaine and approximately 2.6 kilograms of powder cocaine to VILLOT-SANTIAGO's customers on behalf of VILLOT-SANTIAGO.

### VILLOT-SANTIAGO and JONATHAN

78. As discussed above, agents identified JONATHAN as the brother of VILLOT-SANTIAGO. Based on the investigation, I believe that JONATHAN and VILLOT-SANTIAGO worked together to obtain kilogram quantities of cocaine. Because they are brothers, and are both sensitive to law enforcement detection, I believe they communicate mostly in person, as opposed to over the telephone. I also believe that PEDRO and JONATHAN both sell powder cocaine, as well as crack cocaine that they make by "cooking" the powder.

79.     On February 15, 2020, agents intercepted a series of calls during which JONATHAN and VILLOT-SANTIAGO discussed obtaining additional supply of drugs. During those calls, VILLOT-SANTIAGO told JONATHAN that he sent $80,000 to Puerto Rico for "four watches," which based on the investigation, I believe to be a reference to four kilograms of cocaine. VILLOT-SANTIAGO told JONATHAN that the money had not arrived, and he was still waiting on additional supply to arrive from Puerto Rico. During the same call, JONATHAN told VILLOT-SANTIAGO about another source of supply, who would give him a kilogram for "30" if he paid cash, and for "32" if he got it on credit. Based on my training and experience, I believe that during this call the words "30" and "32" referred to $30,000 and $32,000 respectively. I believe JONATHAN was telling VILLOT-SANTIAGO that if he paid for the kilogram upfront, the cost would be $30,000, but if he got it on credit, the cost would be $32,000. VILLOT-SANTIAGO asked JONATHAN if the drugs were any good, and JONATHAN said, "Of course, the one I had was fucking good. I got rid of… I moved two in about a week and a half." Based on my training and experience, I believe JONATHAN meant that he was able to sell ("move") two kilograms in a week and a half. VILLOT-SANTIAGO told JONATHAN to get him "two" and to "get the money from there." I believe that VILLOT-SANTIAGO was telling JONATHAN to get him two kilograms ("two"). Based on the investigation, I believe that JONATHAN and VILLOT-SANTIAGO worked together to sell drugs, and that they shared various locations where they stored, manufactured, and packaged drugs, and that they also stored their drug proceeds at shared locations ("get the money from there").[11]    Based on intercepted calls, surveillance, and

---

[11] Agents did not intercept additional calls related to this potential acquisition of additional drug supply. As such, I do not know whether JONATHAN actually obtained drugs for VILLOT-SANTIAGO on this occasion. However, based on the nature of the conversation, as well as the background of the investigation, I believe VILLOT-SANTIAGO and JONATHAN worked together to obtain and distribute drugs.

controlled purchases, I believe that VILLOT-SANTIAGO and JONATHAN sold both powder and crack cocaine to lower level drug traffickers and drug users in Fitchburg and the surrounding communities. As noted above, and discussed below, both VILLOT-SANTIAGO and JONATHAN employed TORRES to deliver narcotics to customers.

### Controlled Purchases of Crack and Powder Cocaine From JONATHAN

80.     Between January and July 2020, agents utilized a cooperating witness (hereinafter, "CW-4")[12] to conduct three controlled purchases of crack and powder cocaine from JONATHAN. In total, CW-4 purchased approximately 34 grams of crack cocaine and approximately 58 grams of suspected powder cocaine from JONATHAN.

#### *January 2020 – Controlled Purchase for Half an Ounce of Crack Cocaine*

81.     During the last week of January 2020, CW-4 ordered "half an ounce" of crack cocaine for $600 from JONATHAN. The call was made in the presence of agents, but was not recorded. JONATHAN told CW-4 that his "guy" had the "work" and that JONATHAN would call back to tell CW-4 where to go to purchase the drugs. Telephone records indicate that JONATHAN called TORRES approximately four minutes after speaking with CW-4. Later that morning, JONATHAN sent CW-4 a text message telling CW-4, "in couple minutes he will meet you." JONATHAN called CW-4 and told CW-4 to walk to a specific location, and that his "guy" would pick up CW-4.

82.     Agents searched CW-4 for contraband and personal money with negative results.

---

[12] CW-4 voluntarily contacted law enforcement to provide agents with information regarding the Villot family. CW-4 advised that the Villot brothers had been operating a high-level cocaine and crack cocaine distribution organization in the Fitchburg area for several years. CW-4 has a criminal history that includes multiple arrests for drug offenses, larceny, resisting arrest, and driving offenses. In 2015, CW-4 was convicted for distribution of heroin and involuntary manslaughter related to the death of a drug customer. CW-4 served a term of imprisonment and was released in 2019. CW-4 has been monetarily compensated for CW-4's assistance. CW-4 is a testifying cooperator.

Agents provided CW-4 with a covert audio/video recorder, a transmitter that allowed agents to hear CW-4 in real-time, and $600 in official agency funds to purchase the crack cocaine. Agents activated the recording equipment and dropped CW-4 in the agreed upon area. Agents conducting surveillance observed two men leave a location previously identified as a potential stash house for JONATHAN, VILLOT-SANTIAGO, and TORRES. The men got into a green Toyota Camry and drove away. I believe one of the males observed was TORRES. Shortly thereafter, CW-4 received a call from JONATHAN telling CW-4 to look for a green Toyota Camry. Less than two minutes later, agents observed the green Toyota Camry stop next to CW-4. CW-4 entered the back seat of the vehicle, which drove around the block, and then CW-4 exited the vehicle less than a minute later. CW-4 then met with agents to de-brief and provided them with the suspected crack cocaine. Agents searched CW-4 for additional contraband or money with negative results. CW-4 told agents that the driver of the vehicle, believed to be TORRES, gave CW-4 the crack cocaine in exchange for $600. Laboratory results confirm the substance to be 11.7 grams of crack cocaine.

### *February 2020 – Controlled Purchase for One Ounce of Crack Cocaine*

83.     During the last week of February 2020, CW-4 made arrangements for JONATHAN to sell CW-4 one ounce of crack cocaine for $1,100. While in the presence of agents, CW-4 called JONATHAN, and JONATHAN instructed CW-4 to go to Fitchburg, and that he would call CW-4 back to provide a more specific location. JONATHAN also told CW-4 that he had already dropped the drugs off with his "cousin." Approximately four minutes later, while still in the presence of agents, CW-4 received another call from JONATHAN. During that call, JONATHAN instructed CW-4 to wait near the same location where CW-4 was picked up for the January deal. JONATHAN told CW-4 that his runner was dropping something off, but would meet CW-4 right after he was done.

84.     JONATHAN subsequently sent CW-4 text messages instructing CW-4 to call his "cousin."  CW-4 did as instructed, in the presence of agents, and spoke with an unknown male, believed to be TORRES.   During that call, CW-4 provided the location where CW-4 was waiting, and the unknown male said he would "be right there."

85.     Agents searched CW-4 for contraband and personal money with negative results. Agents provided CW-4 with a covert audio/video recorder, a transmitter that allowed agents to hear CW-4 in real-time, and $1,100 in official agency funds to purchase the ounce of crack cocaine. Agents dropped off CW-4 near the agreed upon location, and maintained surveillance of CW-4 for the duration of the operation.

86.     Agents observed a silver Toyota Rav4 stop in front of the residence agents previously identified as a stash house used by TORRES, VILLOT-SANTIAGO, and JONATHAN. Agents observed VILLOT-SANTIAGO exit the vehicle, and observed TORRES drive the Toyota Rav4 directly to meet with CW-4.   Agents observed CW-4 get into the Toyota Rav4 with TORRES.   TORRES drove around the block before dropping CW-4 off back at the meeting location.   TORRES went directly back to the suspected stash house immediately after the deal with CW-4.

87.     Agents picked up CW-4 after the deal and deactivated the recording equipment. CW-4 gave agents a clear plastic bag containing the suspected crack cocaine.   CW-4 told agents that the driver of the Toyota Rav4 gave CW-4 the crack cocaine in exchange of the $1,100 in official agency funds.   Agents searched CW-4 for contraband or money with negative results. Laboratory results confirm the substance to be approximately 23.1 grams of crack cocaine.

88.     During the first week of July 2020, CW-4 ordered two ounces of crack cocaine from JONATHAN.   The call was not recorded, nor was it made in the presence of agents, but it was confirmed via telephone records.   While in the presence of agents, CW-4 subsequently sent JONATHAN a text message confirming the planned deal.   JONATHAN responded via text message, "I have to make that is not ready."   Based on the text message, I believe JONATHAN had powder cocaine available, but needed to cook some of it into crack cocaine to supply two ounces to CW-4.   During subsequent communications, made in the presence of agents, CW-4 agreed to purchase two ounces of powder cocaine instead.

89.     JONATHAN sent CW-4 a text message directing CW-4 where to meet him. Agents searched CW-4 for contraband and personal money with negative results.   Agents provided CW-4 with a covert audio and video recorder that allowed agents to monitor CW-4 in real-time.   Agents also provided CW-4 with $3,600 in official agency funds to purchase the two ounces of cocaine and drove CW-4 to the agreed upon meeting location.   JONATHAN called CW-4 and said he would meet CW-4 soon.   Agents subsequently observed JONATHAN drive from his residence to the agreed upon meeting location.   Agents observed JONATHAN park his vehicle next to CW-4.   CW-4 entered the front passenger seat, and JONATHAN drove around the block before stopping on a side street to let CW-4 out of the vehicle.

90.     Agents picked up CW-4 a short distance away and deactivated the recording equipment.   CW-4 gave agents a clear plastic bag containing the suspected cocaine, and told agents that JONATHAN gave CW-4 the cocaine in exchange for the $3,600 in official agency funds.   CW-4 confirmed to agents that the person who delivered the two ounces of suspected cocaine was the same person CW-4 spoke with on the phone to set up all three controlled

purchases. Agents conducted a TruNarc presumptive test on the cocaine. The drugs tested positive for the presence of cocaine with a weight of 58.7 grams, including the clear plastic packaging. The suspected cocaine was sent to the DEA Northeast Drug Laboratory for further testing and results are pending. Agents reviewed the video captured during the deal, and were able to positively identify JONATHAN as the person who sold the cocaine to CW-4.

### Arrest of VILLOT-SANTIAGO and JONATHAN

91.     On July 22, 2020, a federal grand jury returned a superseding indictment charging VIDARTE, PAREDES, MARTINEZ, VILLOT-SANTIAGO, TORRES, JONATHAN, and twelve others, with drug trafficking offenses. Also on July 22 and 23, 2020, this Court issued search warrants authorizing agents to search JONATHAN's residence and VILLOT-SANTIAGO's residence. *See* 20-MJ-6485-MPK and 20-MJ-6486-MPK respectively. On July 23, 2020, agents arrested VILLOT-SANTIAGO, JONATHAN, and six others in connection with the superseding indictment.

92.     Agents arrested JONATHAN at his home, and subsequently executed a search warrant at that location. As a result of that search, agents seized approximately $8,521 in U.S. currency.

93.     Agents arrested VILLOT-SANTIAGO at his girlfriend's home. After being advised of her *Miranda* rights, VILLOT-SANTIAGO's girlfriend signed a consent to search her apartment. As agents proceeded to secure the premises and conduct the consent search, they observed two drawstring bags and one paper bag containing large quantities of U.S. currency in plain view in the bedroom in the residence. The bags were found on the floor a short distance away from the bed. Two of the three bags were open and the money was plainly visible inside the bags. The third bag was identical to one of the bags and it was obvious from the appearance

and shape of outside of the bag that it also contained money. As agents continued the consent search they located a loaded handgun under the mattress towards the headboard in the bedroom where the money was found. The cash located in the bedroom totaled approximately $252,600 in U.S. currency. Agents subsequently learned that the gun was stolen.

94.     Agents executed a search warrant at VILLOT-SANTIAGO's residence. Upon executing that search, agents located drug manufacturing equipment commonly used to cook powder cocaine into crack cocaine. Some of the items appeared to have cocaine residue on them. Agents also seized additional ammunition at VILLOT-SANTIAGO's residence.

### CONCLUSION

95.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other investigators and witnesses. This affidavit is intended to present facts supporting the pre-trial detention of PABLO VIDARTE HERNANDEZ, ADIANGEL PAREDES, KEVIN MARTINEZ, RICKY FIGUEROA, PEDRO VILLOT-SANTIAGO, IVAN TORRES, and JONATHAN VILLOT, and does not set forth all of my knowledge about this matter.

Signed under pains and penalties of perjury this __28__ day of July, 2020.

_____
Adam Lord, Task Force Officer
Federal Bureau of Investigation